[Cite as *Clark v. Angiulli, Inc.*, 2026-Ohio-2281.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| ALEX CLARK, | : | APPEAL NO. C-250346 |
| | | TRIAL NO. A-2304666 |
| Plaintiff-Appellant, | : | |
| | | |
| vs. | : | |
| | | *JUDGMENT ENTRY* |
| ANGIULLI, INC., d.b.a. MARTINO'S ON VINE, | : | |
| | | |
| Defendant-Appellee. | : | |

This cause was heard upon the appeal, the record, the briefs, and arguments.

For the reasons set forth in the Opinion filed this date, the judgment of the trial court is affirmed in part and reversed in part, and the cause is remanded.

Further, the court holds that there were reasonable grounds for this appeal, allows no penalty, and orders that costs be taxed 50 percent to the appellant and 50 percent to the appellee.

The court further orders that (1) a copy of this Judgment with a copy of the Opinion attached constitutes the mandate, and (2) the mandate be sent to the trial court for execution under App.R. 27.

**To the clerk:**

**Enter upon the journal of the court on 6/17/2026 per order of the court.**

By:_____
      **Administrative Judge**

[Cite as *Clark v. Angiulli, Inc.*, 2026-Ohio-2281.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| ALEX CLARK, | : | APPEAL NO.  C-250346 |
| | | TRIAL NO.  A-2304666 |
| Plaintiff-Appellant, | : | |
| vs. | : | |
| | | *O P I N I O N* |
| ANGIULLI, INC., d.b.a. MARTINO'S ON VINE, | : | |
| Defendant-Appellee. | : | |

Civil Appeal From: Hamilton County Court of Common Pleas

Judgment Appealed From Is: Affirmed in Part, Reversed in Part, and Cause Remanded

Date of Judgment Entry on Appeal: June 17, 2026

*Beck Law Center* and *Kimberly Beck*, for Plaintiff-Appellant,

*Rendigs, Fry, Kiely & Dennis, LLP*, *Jonathan P. Saxton* and *James J. Englert*, for Defendant-Appellee.

**ZAYAS, Judge.**

{¶1} This case presents a question of whether summary judgment in favor of a bar establishment was proper on claims asserted by a patron for vicarious liability and premises liability arising from an altercation that occurred one night at the bar establishment. Plaintiff-appellant Alex Clark, the patron, appeals from the trial court's grant of summary judgment in favor of the defendant-appellee Angiulli, Inc, d.b.a Martino's on Vine ("Martino's"), the bar establishment, and argues in a single assignment of error that the trial court erred in granting summary judgment in favor of Martino's on the vicarious-liability and premises-liability claims. For the reasons that follow, we sustain the assignment of error in part and reverse the trial court's grant of summary judgment as to the vicarious-liability claim as genuine issues of material fact remain to be determined on this claim. As to the premises-liability claim, we overrule the assignment of error as to this claim and affirm the trial court's grant of summary judgment in favor of Martino's on this claim. The cause is remanded for further proceedings on the vicarious-liability claim.

## I. Background

{¶2} Clark initiated this action against Martino's, asserting claims for vicarious liability and premises liability, among others.[1] The claims arose from an alleged altercation that occurred at Martino's on or about Sunday, August 6, 2023, between 1:00 a.m. and 2:00 a.m. The altercation was allegedly between Clark and either Martino's employees or agents, or other patrons. Martino's answered the complaint, asserting a defense—among others—that it was not responsible for

---

[1] The complaint was also filed against John Doe defendants 1-20, and asserted a claim for assault and battery against the John Doe defendants and a third claim against Martino's for negligent training and supervision. The trial court found the action against John Does defendants 1-20 never commenced under Civ.R. 3(A) as Clark failed to perfect service on these defendants within one year as required.

independent and unforeseeable actions of third parties, over which it had no control. Martino's later moved for summary judgment on Clark's claims, and the trial court granted summary judgment in favor of Martino's.[2]

{¶3} The trial court entered summary judgment in favor of Martino's on Clark's claim for vicarious liability after finding that Martino's met its initial burden to show that the "attackers" were "not employees" of Martino's and Clark failed to meet his reciprocal burden to set forth "evidentiary facts" showing that the attackers were employees. The trial court granted summary judgment in favor of Martino's on Clark's claim for premises liability after finding that "[n]othing in the record demonstrates that . . . Martino's could have foreseen the type of assault that occurred in this case." Clark now appeals.

## II. The Summary-Judgment Record

### A. The Arguments

{¶4} Martino's moved for summary judgment on Clark's claims, arguing that there "is no question" that the individuals who "interacted with" Clark that night were not employed by Martino's, nor were they agents of Martino's, and it was not foreseeable that such an altercation "with patrons" would occur. The motion was supported by an affidavit from the bar manager and several depositions, including those of Clark, the bartender, the bar manager, and another bar employee.

{¶5} Clark responded in opposition to summary judgment, arguing that genuine issues of material fact remain as to whether "the assailants" were employed by Martino's and whether Martino's owed Clark a duty as an invitee to prevent a "foreseeable harm" once the fight began and was therefore required to stop the fight

---

[2] The trial court also granted summary judgment in favor of Martino's on Clark's claim for negligent training and supervision. Clark does not challenge this ruling on appeal.

as soon as possible, which Martino's did not do where the bartender walked away from the assault and never addressed the assailants at all and where the bar manager "handed" Clark back to one of the assailants. In other words, Clark asserted that Martino's had a duty to stop the fight after it started as the risk of harm from an ongoing assault was foreseeable. The response relied upon the same evidence submitted by Martino's, as well as an affidavit from Clark's counsel.

{¶6} Martino's filed a reply in support of its summary-judgment motion, arguing that the evidence could only reveal that the individuals in question were not employees or agents of Martino's and that the duty to stop an ongoing fight is not supported by Ohio law as Ohio law uses the totality-of-the-circumstances test to determine foreseeability.

### B. The Evidence

#### 1. Affidavit of the Bar Manager

{¶7} The bar manager of Martino's is the custodian of the surveillance videos that are kept as part of his file and maintained in the ordinary course of business. The bar manager averred that retaining and obtaining surveillance footage of incidents that occur at Martino's is part of his duties as the manager of Martino's, and he obtained a video of the incident at issue this matter. He claimed that the video was a fair and accurate depiction of the events that occurred and the time and date stamps are true and accurate and reflect the actual timing of the events displayed.

#### 2. The Video

{¶8} The video appears to be an excerpt of the surveillance video. There are four individuals in the video, including Clark, that are engaged in the physical altercation that took place that night. One individual, Forehead, is wearing a white shirt with a red lanyard around his neck. A second individual, Caleb, is wearing a red

shirt. The employment or agency status of these two individuals is the governing subject of this case. A fourth individual in a blue shirt, Jaalen, eventually got involved in the altercation.

{¶9} When the video begins, Clark is standing with Forehead, Caleb, and the bartender. Forehead is sitting on a red stool near the exit. Clark is standing by another red stool near the exit. The red stools are positioned alone against a partition—one stool on each side—that forms one side of a short walkway to the exit. The stools are positioned away from the other bar seating, and no table is available for use while sitting at these stools. One stool—the stool that Caleb is standing next to—is facing the exit door, and the other stool—the stool that Forehead is sitting on—is facing the bar. The bartender attempts to pull Clark—who is talking to Forehead—toward the exit and Clark slaps the bartender's arm. Forehead immediately springs into action and punches Clark. Caleb immediately comes around the end of the partition—and the stool that he is standing next to—and punches Clark as well.

{¶10} The altercation between these three individuals continues for around 15 seconds. Then, Caleb attempts to guide Clark toward the exit of the bar. As he is doing so, Jaalen comes into the bar from the exit and restarts the altercation. All four individuals then engage in another physical altercation for around ten seconds. At that point, Jaalen leaves the bar. The bar manager then comes into the video and holds Caleb back from following Jaalen out the exit.

{¶11} As he is doing so, Clark tries to push Forehead, who is just standing in the area at this point. After that, Forehead pushes Clark towards the exit. Clark then attempts to start a physical altercation with the bartender, who is standing nearby. At that point, the bar manager comes back and grabs Clark and turns him toward the exit. As the bar manager turns around with Clark, Caleb is standing there and reaches for

Clark. The bar manager lets Caleb take Clark and Caleb then pushes Clark out of the exit.

### 3. Deposition of the Bar Manager

{¶12} The bar manager testified that, around 2:00 a.m., the bartender called him over and said that he was having a problem with a patron. He walked over and asked the patron what the problem was, but the patron "kind of waived it off" since it was over a "6.50 tab." So, he proceeded to do other things. He missed the first part of the altercation because he was in the bathroom fixing a paper towel dispenser. He then "went over and broke everything up." As he was breaking up the altercation, Clark was "walking over fixing his hat and [then] proceed[ed] to like try to swipe at [the bartender]." So, he grabbed Clark by the shirt and told him to stop and that he needed to leave. Clark grabbed him in response "and then that's when one of the other gentlemen just grabbed him and like threw him out of the door." When asked if this "other gentleman" was an employee of Martino's or someone else, the bar manager answered, "Someone else. I have no clue who it was. He was just trying to help me because Mr. Clark had me by the shirt like, too, and he was like very angry."

{¶13} The bar manager was asked to identify the people in the video. He identified Clark and the bartender. He denied knowing Forehead or Caleb. He remembers the man "in the blue shirt," Jaalen, barreling in and tackling everybody, and he ran over when Jaalen came through the door. He was telling everyone to "stop, just stop."

{¶14} When asked if Martino's employs bouncers, the bar manager responded, "We do sometimes, but I'm pretty sure that was in the summer so it's slower that we don't really need them." He further stated, "I'm pretty sure the bouncers that worked that night it was so slow, I'd already paid them and asked them

to just leave because we were closing up." When asked if the bartender knew Forehead or Caleb, he responded, "That I don't necessarily know, no." He denied seeing Forehead or Caleb in the past. When asked if he talked to any of "those people" after the fight, he answered, "No. I was pretty upset and I told everyone to get out."

### 4. *Deposition of the Other Bar Employee*

{¶15} Another bar employee ("the other bar employee") works at Martino's and was asked to identify the individuals in the video. She denied knowing Forehead. She said, "He looks familiar, but I don't know who that is." She agreed that she knew him from being around Martino's. When asked how often she would say Forehead was at Martino's, she replied, "Not often at all." When asked if he was friends with the bartender, she answered, "He might be. I'm not sure about that." When asked if she recognized Caleb, she answered, "I do not." When asked if she recognized anyone else in the video, she said she only recognized the bar manager and the bartender.

### 5. *Deposition of the Bartender*

{¶16} The bartender on the night in question is a former kicker for the University of Cincinnati ("UC") football team through the 2020/2021 season. During his deposition, the following exchange occurred regarding bouncers at Martino's:

Q:     Did you have bouncers at Martino's?

A:     When I played football, I know some of like the guys on the football team that were bigger, [the bar manager] had asked if they could, you know, work the door, make sure people don't sneak in or stuff like that.

And then when I was bartending, there was a lot of people in and out that would hang out or they would be there all night. So I know we had bouncers, but I don't know how many off the top of

my head; or when I was there, it wasn't the football guys anymore, since they all graduated or transferred.

Q:    Okay.  So were there bouncers that were not football players?

A:    Yes.

Q:    And then sometimes when the football players came in, either [the bar manager] or –what other name did you say?

A:    I call him [the bar owner], but I believe his real name is [the bar owner].

Q:    Okay.

A:    I believe so, though.

Q:    Okay.  Either [the bar manager] or [the bar owner] would ask like one or two of the football players to just keep an eye on the door and make sure people didn't sneak in?

A:    Yeah.  They would have somebody sit at the front door and check IDs.  And they would have somebody sit at the very back door. And there was some -- there would be quite a few times there would be a bouncer stand in the stairwell because they have another side door by the stairwell to where, if you walk all the way down the stairs, there's a door that people could be let in through.

Q:    Okay.

A:    So those are the three locations that we'd have a bouncer at.

{¶17}  He listed the players who worked at Martino's when he was playing football and then said, "But then the following years, it was a job for football players, at off-season time, to go work a night or two.  So the O line would pick up freshman

linemen that would just fall in place, basically."

{¶18}   Regarding the night in question, he said he called last call at 1:45 a.m., like they usually do.  As he was cleaning, "two kids" were yelling at him because Clark was starting to "create a scene."  He turned around, and Clark was yelling at him and "hit one of the beer bottles towards [him]."  He immediately got the bar manager and said Clark needed to leave.  Clark "kept yelling about a receipt," and was "getting really aggressive with it, started yelling."  He said Clark was yelling at him "at the top of his lungs in anger."  He tried to tell Clark that he did not have his receipt because he didn't serve him.  He went to ask the bar manager because the system was closed, and when he came back is when Clark smacked the can at him and started yelling more.  He yelled at the other bar employee to find the bar manager.  He told Clark "several times" that he needed to leave the bar because they were closing.  He said, "And usually, when somebody is drunk and angry like that when we're closing, we just try and tell them to go outside."  After Clark smacked the can, Clark "walked to his buddy," and his buddy left.  Clark was still there for a while.[3]

{¶19}   The bartender identified Forehead as Forehead.  He denied that Forehead was a football player.  He said, "We actually didn't have any football players working during -- because this was during football season.  So during football season, football players don't work."  He said Caleb is related to Forehead "in some way," either "blood brothers" or "stepbrothers."  When asked if Caleb worked at Martino's, he replied, "I don't want to put those words out of my mouth because I was a bartender.  So that's one where, if he was, that's a [bar manager] question because he does the hiring process."  He continued, "He was there a lot, but I never saw him get paid as a

---

[3] None of these events are shown in the video excerpt before this court.

bouncer." He said that Forehead was there "quite often" when he first started bartending. He stated, "I just didn't really know of him." When asked if Forehead would stay until closing, he replied, "Sometimes. Because there was times throughout the night that they would also just disappear." He continued, "Like they would go down the street to get food and not come back."

{¶20} When discussing Forehead, he pointed to the video and said that bouncers would sit in "the red barstool chair." He said the bar manager would have the bouncers come in, and they would "have bouncers there, the back, and the side." When later questioned by counsel for Martino's, he was again asked where the bouncers usually are, and he said,

> That red barstool chair that was pointed out in the video -- I forgot where we point it out in the video at, I think it was early on -- that's where one of the bouncers were usually located at.

> But we stopped letting people in at 1:30, and we'll have a -- [the bar owner or the bar manager] will lock the front door. So the only way out is going through it. You can't come in it. So our bouncer leaves the front, usually, around 1:30.

> And they'll move upstairs to get everyone out of the upstairs so we can close upstairs.

{¶21} When asked if it was safe to say that Martino's employees that night were wearing black shirts, he replied, "That night, yes." When asked if that meant anyone not wearing a black shirt was not a Martino's employee, he said,

> That's kind of hard to answer. I will say, for the most part, working for Martino's, we're told to wear either Martino's attire or Cincinnati attire. In that picture, I know me, [the bar manager], and

[the other bar employee] are all wearing black, yes. I don't know what other bartenders were wearing that night, or the servers.

**{¶22}** When asked if it was "safe to say that the way to designate a Martino's employee is with black or UC gear," he answered, "Yes."

**{¶23}** When again asked if Forehead was an employee at the time, he replied, "I can't answer that question. I've seen him around, but I don't know if he worked for Martino's or if he didn't." He denied knowing if Forehead or Caleb were working that night. When asked if they had worked there before, he answered, "That is a question for [the bar owner or the bar manager]. I do not hire people." When asked if "outside of the hiring process" he knew if they were employees, he replied,

> I didn't know if they were employees. Our bouncers, we would usually pay on the side, not in front of the bartenders and servers. So if they're there, they might be there working.
>
> I never saw them get paid physically, so I can't confidently say I know they worked there.
>
> But they did hang out there a lot when I was there.

**{¶24}** When asked if they were hanging out there that night, he said, "Yes." When asked whether they were "just hanging out," he answered, "I would imagine so. When I'm bartending, I don't really notice who all's there, who all's not unless, they're in my section." When asked if, to the best of his knowledge, Caleb and Forehead were patrons that day, he replied, "To the best of my knowledge, yes."

**{¶25}** When asked why he was outside the bar area in the start of the video, the bartender said he jumped the bar after Clark hit him with "the bottle" because he "wanted to get [Clark] out." He said the bar manager was "nowhere to be found," and Clark was "creating a very big scene." He said, "I mean, as you can see, everyone in

the video here was staring at him as he was yelling at basically everyone in the bar." He described Clark as "intoxicated" and "slurring his words when he was yelling." He said, "Once he kept going, tried to tell him to leave, wouldn't leave, and that's the video."

{¶26} When asked why Forehead hit Clark if the confrontation was between him and Clark, he said, "A lot of people that come to Martino's know me and [the bar manager] very well." He said his "title" was very known of being a college football player. He continued, "And I've had a lot of people stand up for me and defend me in situations." He further stated, "But I think it was more of a defense mechanism that – I mean, the way he hit. If it's on full volume, it sounds like a hit." He said, "Some people's first instinct is to defend somebody."

{¶27} When asked by counsel for Martino's if he would say Caleb and Forehead "just saw a fight and tried to defend" him, he answered, "I would say it goes back to the slap. You could hear it on the video. It was pretty loud. I think that might have just sparked a defense mechanism in them." When asked if he would say they were "looking out for him as a friend," he replied, "I would say yes."

{¶28} The bartender identified Jaalen as the gentleman with Clark.

### 6. Deposition of Clark

{¶29} Clark testified that he started the evening by meeting up with his friend Jaalen, who was working at Rhinegeist Brewery. They started their night around 10:00 to 10:30 p.m. at Dive Bar, two establishments over from Martino's. They were there for around an hour and a half, and then they walked over to Martino's. A bouncer—a "tall, white guy"—on the right side of the door checked their IDs. He went to the bar, and Jaalen went to the restroom. When asked if he could tell the difference between bar employees and patrons, he replied that he believed the bouncer was

wearing a black shirt and the bartenders were wearing black shirts. When asked if he could recall any other bouncers or other employees not behind the bar, he said that he noticed one bouncer inside sitting on a stool around six or seven feet inside the door. He spent almost the entire night up until closing on the patio.

{¶30} When they noticed it was getting late, they went inside to get another beer. When he asked for another drink, the bartender said his tab was closed. Jaalen left to go back to Dive Bar to see if he could get them another drink. Clark told the bartender that he did not close his tab and asked for an itemized receipt. The bartender replied that there was "like a thousand people in here." He could tell the bartender was busy. He proceeded to ask the bartender again for an itemized receipt. He said, "And I also will note, you know, to get his attention after the first time I did kind of prop myself up on the railing under the bar to kind of make myself look a little taller as the bar was busy, and that's -- that was prior to me asking him again for an itemized receipt, which he kind of scoffed at and then went to the POS system." After three to four minutes, the bartender gave him a receipt that was not an itemized receipt. He testified,

> And I looked at him and I said, does this look like an itemized
> receipt to you? And that's when he motioned at the bouncer, who is
> seven feet in front of the door to the right.

> And that is when I took my receipt that wasn't itemized. After he
> motioned and pointed at the bouncer, I went over to the bouncer.[4] I
> showed him my receipt. I said, look, all I'm trying to do is get an
> itemized receipt.

---

[4] It is at this point that the video excerpt before this court appears to begin. None of the events alleged prior to this are shown in the video excerpt.

At that point, you know, I'm kind of focused on my receipt, not on the bouncer. At that point, two or three other employees, you know, kind of came around the front of me again.

I'm, at this point, somewhat facing the bar, but, you know, it's two or three guys around me. And then [the bartender] who scoffed at me came around the bar and came up and ran up to me really quickly. I put my hands out to stop him. And as soon as my hands touched his chest, I was struck by the bouncer that was to the left of me. And I think that first blow is the one that caught me on my cheek.

**{¶31}** He denied being kicked out of the bar "at any point" by the bartender or ever throwing a punch at anyone. He described his interaction with "the bouncer" sitting in the stool. He said, "I kind of went up to the side of him and showed him the receipt that I was looking for. And we were both facing the bar at that point." He said, "And we exchanged no words." When asked how he knew this man was a bouncer, he replied, "Because he was sitting on a stool. I'm almost certain he was wearing a black T-shirt." He continued, "But, again, I knew that he was a bouncer by the bartender motioning over to him, pointing at him, and, you know, me looking at him while he was looking back at me." He again said that this bouncer "exchanged no words" with him. When asked if he knew this man was a bouncer because he had a black shirt on, he replied, "Black shirt on and that the bartender, you know, motioned over to him. Pointed to him and pointed at me." He said four people were standing around him prior to the first punch: the bartender, the bouncer, and two others who he could not describe.

**{¶32}** Regarding the bartender motioning to the alleged bouncer, he said, "And that is when he pointed to the bouncer and then pointed to me, and the bouncer

15

looked at me. And before the bouncer could do anything, that's when I proceeded to walk up to the bouncer, the man on the stool."

{¶33} Clark said that he was in shock after "getting knocked around in the head" and does not recall "a whole lot after that." He said,

> Again, I remember trying to get up off the floor at least once or twice, and that's when my friend Jaalen came back into the bar. And really what all I remember from that point on is him grabbing my arm, picking me up off the floor saying we got to go, we got to go, and he walked me out of the bar.

{¶34} When asked if Martino's staff escorted him out of the bar, he said, "No." He again said that Jaalen was the one who assisted him out of the bar. He said they were both in shock when they were walking out because Jaalen "got assaulted as well trying to help me." They then just walked down the street. When asked about his statement that Jaalen got hit as well, he said, "From his story. I can't speak to Jaalen."

{¶35} The next morning, he picked his wallet up at Martino's from the same guy that checked his ID the night prior. Then he went to the VA Hospital to get checked out. He said, from what he can recall, they "didn't see anything serious." They just found some bruising and "breaking of the skin." He also had a chipped tooth. He was advised to take over-the-counter pain medication. He scheduled an appointment with a dentist to have his tooth repaired with a filling. He was told the cracked tooth "will most likely present an issue in the future." That side of his mouth was "really tender," so he had to be "very careful on how [he] went about eating foods." He denied having to change his diet. He also denied still experiencing pain in this area, or having to go to the VA Hospital again for any issues related to the incident. He said facing customers at work "with a bruised and beaten face" was embarrassing and a "blow to

[his] ego." The marks were visible on his face for four to five weeks.

### 7. Affidavit of Clark's Counsel

**{¶36}** Clark's counsel averred that the discovery responses attached to her affidavit were Martino's true and accurate discovery responses. In the responses, Martino's denied that Caleb or Forehead worked at Martino's as a bouncer. Martino's further denied that it had paid either of these individuals to perform work for Martino's, "as a bouncer or otherwise." Martino's further said that it had no documents to produce in response to the requests for the employment files of these individuals as they were not "employees." In response to other requests for the employment files of other certain unknown individuals (the names in the requests were blacked out), Martino's denied having any responsive documents to the requests as the individuals named were "temporary/occasional worker[s] and [were] paid cash."

## III. Law and Analysis

**{¶37}** In a single assignment of error, Clark argues that the trial court erred in granting summary judgment in favor of Martino's. In the first issue presented for review, Clark asserts that the trial court "erroneously found that there is no genuine issue of material fact as to whether [Forehead and Caleb] were employees of Martino's." In the second issue presented for review, Clark argues that the trial court erred by granting summary judgment on the premises-liability claim in favor of Martino's "without considering Mr. Clark's arguments that Martino's breached its duty to protect invitee Alex Clark from foreseeable harm after the assault."

### A. Standard of Review

**{¶38}** "This court reviews a trial court's grant of summary judgment de novo." *Environmental Solutions & Innovations, Inc. v. Edge Eng. & Science, LLC*, 2023-

Ohio-2605, ¶ 6 (1st Dist.), citing *Mid-Century Ins. Co. v. Stites*, 2021-Ohio-3839, ¶ 10 (1st Dist.). "Summary judgment should be rendered in the [moving] party's favor if the timely filed Civ.R. 56(C) permissible evidence shows that there is no genuine issue of material fact, and the nonmoving party is entitled to judgment as a matter of law." *Id.*, citing Civ.R. 56(C). "Summary judgment 'shall not be rendered unless it appears from the evidence or stipulation, and only from the evidence or stipulation, that reasonable minds can come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made.'" *Id.*, citing Civ.R. 56(C).

**{¶39}** "In other words, to obtain summary judgment, the moving party must show (1) there is no genuine issue of material fact, (2) the moving party is entitled to judgment as a matter of law, and (3) it appears from the evidence that reasonable minds can come to but one conclusion when reviewing the evidence in favor of the nonmoving party, and that conclusion is adverse to the nonmoving party." *Id.* at ¶ 7, citing *Grafton v. Ohio Edison Co.*, 77 Ohio St.3d 102, 105 (1996). "The moving party has the initial burden of informing the trial court of the basis for the party's motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact on the essential elements of the . . . claim." *Id.*, citing *Dresher v. Burt*, 76 Ohio St.3d 280, 293 (1996). "If the moving party meets this initial burden, the nonmoving party then bears the burden of setting forth 'specific facts showing that there is a genuine issue for trial.'" *Id.*, citing Civ.R. 56(E). If the nonmoving party does not do so, then summary judgment, if appropriate, must be entered against the nonmoving party. Civ.R. 56(E).

**{¶40}** "Because the trial court must construe the evidence in the light most favorable to the nonmoving party when ruling on a summary-judgment motion, all

competing inferences and questions of credibility must be resolved in favor of the nonmoving party." *Id.* at ¶ 8, citing *Appellant v. Alpha Phi Alpha Homes, Inc.*, 2019-Ohio-960, ¶ 9 (9th Dist.). "The trial court is prohibited from weighing the evidence or choosing among reasonable inferences at the summary-judgment stage." *Id.*, citing *Alpha Phi* at ¶ 9. "The purpose of summary judgment 'is not to try issues of fact, but rather to determine whether triable issues of fact exist.'" *Id.*, quoting *Walker v. Hodge*, 2008-Ohio-6828, ¶ 19 (1st Dist.). "Thus, if reasonable minds could reach different conclusions based on the evidence, then summary judgment should be denied, and the matter should proceed to trial." *Id.*

{¶41} A litigant's constitutional right to a trial by jury is not abridged by a *proper* granting of a summary-judgment motion. *See, e.g., Siegel v. State*, 2020-Ohio-4708, ¶ 56 (10th Dist.). The rule properly operates "when 'no genuine issue remains for trial.'" *See id.*, quoting *Sartor v. Arkansas Natural Gas Corp.*, 321 U.S. 620, 627 (1944).

### B. *Vicarious Liability*

{¶42} "In Ohio, the doctrine of respondeat superior can hold an employer or principal vicariously liable for the tort of its employee or agent in certain circumstances." *Sitton v. Massage Odyssey, LLC*, 2020-Ohio-4282, ¶ 8 (1st Dist.), citing *Auer v. Paliath*, 2014-Ohio-3632, ¶ 13. "For liability purposes, the tort must be committed within the scope of employment." *Id.*, citing *Auer* at ¶ 13. "Moreover, in dealing with an intentional tort, . . . to fall within the scope of employment, 'the employee's behavior must have been calculated to facilitate or promote the employer's business.'" *Id.*, quoting *Linder v. Am. Natl. Ins. Co.*, 2003-Ohio-5394, ¶ 25 (1st Dist.), and *Byrd v. Faber*, 57 Ohio St.3d 56, 59 (1991). "In other words, a successful claim for respondeat superior demonstrates that a principal-agent relationship exists (e.g.,

employer and employee) and that the perpetrator committed a tortious act within the scope of employment." *Id.*

**{¶43}** "If an employer retains control or the right to control the mode and manner of doing the work contracted for, then the relationship is one of principal and agent." *Wright v. Ohio Dept. of Rehab. & Corr.*, 2014-Ohio-4359, ¶ 9 (10th Dist.), citing *Councell v. Douglas*, 163 Ohio St. 292 (1955), paragraph one of the syllabus.

> In determining whether an employer has the degree of control necessary to establish agency, courts examine a variety of factors, including: whether the employer or individual controls the details of the work; whether the individual is performing in the course of the employer's business rather than in an ancillary capacity; whether the individual receives compensation from the employer, and the method of that compensation; whether the employer or individual controls the hours worked; whether the employer or individual supplies the tools and place of work; whether the individual offers his services to the public at large or to one employer at a time; the length of employment; whether the employer has the right to terminate the individual at will; and whether the employer and individual believe that they have created an employment relationship.

*Id.* at ¶ 10, citing *State ex rel. Nese v. State Teachers Retirement Bd.*, 2013-Ohio-777, ¶ 35, *Hanson v. Hynast*, 24 Ohio St.3d 171, 175, fn. 5 (1986), and Restatement of the Law 3d, Agency, § 7.07, Comment f (2006).

**{¶44}** Beyond that, a principal may also be held liable under a theory of apparent agency. "In order to establish apparent agency, the evidence must show that the principal held the agent out to the public as possessing sufficient authority to act

20

on his behalf and that the person dealing with the agent knew these facts, and acting in good faith had reason to believe that the agent possessed the necessary authority." *Ohio State Bar Assn. v. Martin*, 2008-Ohio-1809, ¶ 41, citing *Master Consol. Corp. v. BancOhio Natl. Bank*, 61 Ohio St.3d 570 (1991), syllabus. "Under an apparent-authority analysis, an agent's authority is determined by the acts of the principal rather than by the acts of the agent." *Id.* "The principal is responsible for the agent's acts only when the principal has clothed the agent with apparent authority and not when the agent's own conduct has created the apparent authority." *Id.*

### 1. *The Arguments*

**{¶45}** The trial court granted summary judgment in favor of Martino's on this claim after finding that Martino's met its initial burden on summary judgment to show Forehead and Caleb were not employees of Martino's and Clark failed to meet his reciprocal burden to set forth "evidentiary facts" showing that Forehead and Caleb were employees.

**{¶46}** Clark argues that there is evidence "sufficient to defeat summary judgment" where he testified that the "bouncers who attacked him were employees of Martino's" and "there are numerous facts that give rise to the inference that Caleb and Forehead were employees." These facts are said to include (1) Caleb and Forehead not sitting at a table or the bar and not having any food or drink, (2) the bartender motioning for him to take up his concerns with Caleb and Forehead, and (3) Martino's being unable to know whether these individuals were employed as bouncers "because Martino's pays its bouncers under the table and keeps no record of who its bouncers are – meaning it does not have employment records or tax records for most if not all of its bouncers."

**{¶47}** Martino's argues that there was no direct evidence that Forehead and

Caleb were Martino's employees, or even acting with actual or apparent authority, where (1) the discovery responses deny that they were employees or were ever paid by Martino's, (2) the bar manager denied knowing who these individuals were, (3) the bar manager testified that the bouncers had already gone home that night, (4) the individuals in question were not wearing black t-shirts while the bartenders and the bar manager were wearing black t-shirts, (5) Clark testified that the bouncer who checked his ID was a tall white guy, (6) Forehead was seated "out of the way of the bar's entryway," and (7) Martino's took no action that clothed Forehead or Caleb with the appearance of authority.

{¶48} Martino's further argues that Clark's claimed "inferences" do not rise beyond the level of speculation. Martino's claims that Clark is "merely speculating" that the bar manager "handed" Clark back to Caleb as if Caleb was an employee while the bar manager—the one with personal knowledge of his employees—testified that Caleb was not an employee. Martino's further claims that there are "many other inferences" that can be drawn from the fact that Caleb and Forehead were not sitting at a table with food and drinks in front of them. Martino's even further claims that the bartender never identified Caleb or Forehead as bouncers, rather just individuals who came to the bar "with a certain degree of regularity," and said that he did not ask Forehead or Caleb for assistance in dealing with Clark.

{¶49} Clark argues in response that there is evidence that Forehead and Clark were employees where (1) Forehead and Caleb were sitting/standing at the bar area without drinks or food, were not at a table or the bar and therefore did not appear to be customers, (2) the bartender signaled that Clark should address his concerns with the receipt to Forehead and Caleb, (3) Caleb defended the bartender as soon as Clark slapped the bartender's arm away, and (4) the bar manager grabbed Clark by the shirt

and "handed him" to Caleb so that Caleb could throw him out. Clark asserts that this evidence is sufficient for a reasonable person to conclude that the individuals were employees, creating a jury question.

## 2. *Analysis*

{¶50} Martino's moved for summary judgment below on the basis that there was "no question" that Forehead and Caleb were not Martino's employees. The claimed basis for this assertion was the "undisputed testimony" of the bar manager that "confirms" these individuals are not employees or agents of Martino's. The motion states, "In fact, [the bar manager] testified in his deposition that he did not even know who 'Caleb' or 'Forehead' were." The motion further points to the bar manager's testimony that the bouncers on duty that night had already been released from work, and the bartender's testimony that Martino's employees wear black shirts or UC apparel. The motion also states, "It is not as if either of the individuals in the altercation were located at the front of the bar, in black uniforms, monitoring the area, or otherwise acting as if they were employed by Martino's on Vine."

{¶51} We first address the bar manager's testimony that allegedly "confirms" that Caleb and Forehead were not employees or agents of Martino's. In the bar manager's deposition, there was only one instance where he was directly asked if Caleb was an "employee." The exchange was as follows:

Q: When you say one of the other gentleman [Caleb], was this an employee of Martino's or someone else?

A: Someone else. I have no clue who it was. He was just trying to help me because Mr. Clark had me by the shirt like, too, and he was like very angry.

{¶52} Thus, the bar manager appears to say that Caleb is not an "employee"

because he does not know him. This is consistent with the bar manager's other testimony that he does not know Forehead or Caleb, shown below:

Q:    What about this person in the white shirt with the red lanyard [Forehead], do you know who that is?

A:    No.

. . .

Q:    Do you know the person in the red shirt [Caleb]?

A:    No.

{¶53} Thus, the bar manager's testimony, alone, establishes that he did not know Forehead or Caleb. However, Martino's also relied on the bartender's deposition testimony when moving for summary judgment and the bartender's testimony undermines that the bar manager did not know Forehead and Caleb. First, the bartender was asked in his deposition how he knows Forehead and the following exchange occurred:

Q:    And then how do you know Forehead?

A:    Can we be more specific with the word know? As in like --

Q:    You said you call him Forehead.

A:    Yeah.

Q:    Like how did you start calling him Forehead? Like I assume that's a nickname. I can't imagine that's his real name.

A:    Yeah, just from being a football player, we did nicknames. We'd call people by their jersey number, just quick things instead of full names.

       So [the bar manager] had one for me. I prefer not to say it because --

Q:     Okay.

A:     -- it's a little inappropriate.

       But so I just remember the first time meeting him. I want to say [the bar manager] made a joke about his forehead, and that was just his nickname from there on out.

Q:     Okay.

A:     Or maybe [the bar owner] did. [The bar manager or bar owner], somebody made a joke about his forehead, and that was the nickname I just called him from there on out.

Q:     When did you meet him?

A:     The first home Cincinnati game, I think, is when -- I want to say it was that first home Cincinnati game is when I first really got introduced to him.

Q:     Okay. So --

A:     Of the 2023 season.

Q:     Okay. As of August '23, the season hasn't started, though, right?

A:     No, it started.

Q:     Oh. When does the season start?

A:     I think that was the first weekend.

Q:     Okay.

A:     Or was it – '22 maybe. I can't deal with the football seasons.

Q:     I can't keep them straight, either, apparently.

       So you think you met him --

A:     That was the '23/'24 season. So would that be the '24 season?

Q:     So if this is August '23, had you just met him when this

happened?

A:     No. No. I'd seen him there quite a few times prior, but he started the first home football game of '22/'23 season then. He was there during football season, but not over summer, spring. Never saw him then.

Q:     Okay. So mostly, actually, during the football –

A:     Football season.

Q:     So you think you met him like --

A:     It would have been a year prior.

Q:     Okay. So sometime around August 2022?

A:     '22, yes.

Q:     Okay. And [the bar manager or bar owner], you think, introduced you to him?

A:     I want to say it was [the bar manager]. Just, when we're there for shifts earlier, we'll usually sit at this section of the bar and watch sports, just because -- when the bouncers come in, or if former employees come in, we'll talk there, but usually it's [the bar manager] sitting at the bar with me.

Q:     Okay. You pointed to your diagram. Where on the diagram did you point to when you said you usually sit at the bar and watch sports?

A:     It would be --

Q:     Like just right at the entrance?

A:     -- right at the entrance, yeah.

Q:     Okay. And then what about Caleb? How did you meet Caleb?

A:      Caleb has been there since I was playing. Who was the guy he came in with? Caleb has been there since I was in my second season at Cincinnati, so 2021 -- so 2020/2021 season.

Q:      That's the season that was messed up from COVID, right?

A:      Yes.

Q:      Okay. Were you able to go to Martino's during the 2020-to-2021 season?

A:      We weren't really supposed to.

Q:      I understand.

A:      But I did want to work. I was a walk-on, so I kind of needed money to pay for college. So I'd go work on our off weekend.

Q:      Okay. So --

A:      And that's when I remember running into him there.

Q:      So you met Caleb at Martino's probably during the 2020-to-2021 football season?

A:      Yes.

Q:      Okay. Did [the bar manager] introduce you to him, too?

A:      [The bar manager] did not, no. I don't know her name. One of my friends was with -- I think it was his girlfriend or a girl he was with.

Q:      Okay.

A:      And then that's how we got introduced.

Q:      Okay. And did you introduce him to [the bar manager]?

A:      I don't remember introducing him to [the bar manager].

Q:      Okay.

A:      I think later down the road, he did ask about potentially working there. And then I pointed at [the bar manager] maybe. That's usually what I do with most people when they ask for jobs. I'll just say, go to [the bar manager].

{¶54} The bartender testified that it was in the Spring of 2021 that he pointed out the bar manager to Caleb. Further, the bartender testified that both Caleb and Forehead were often at Martino's. The other bar employee also testified that she recognized Forehead from being around Martino's, although she said that Forehead was not there that often. Accordingly, there is conflicting evidence as to whether the bar manager actually knew Forehead and/or Caleb.

{¶55} Martino's next relied on the bar manager's assertion that he had already sent the bouncers home for the evening. This assertion is based on the following exchange:

Q:      Does Martino's employ bouncers?

A:      We do sometimes, but I'm pretty sure that was in the summer so it's slower that we don't really need them.

Q:      Okay.

A:      So like normally during those days, we don't -- like summertime we do not open both floors and we just have like one person at the door.
        I'm pretty sure the bouncers that worked that night it was slow, I'd already paid them and asked them to just leave because we were closing up.
        Like the people in that video are the last people that are in there.

Q:      Okay.

A:     It was closing time.

**{¶56}** Thus, the bar manager testified that he "believed" that this occurred during the summertime, i.e., when UC was not in session, and so he was "pretty sure" that he had already sent the bouncers home since it was slow and the bar was closing. However, in the bartender's deposition, he indicated that this occurred during football season, i.e., not during the summertime when football players would work as bouncers. He testified as follows:

Q:     [Forehead is] a football player, right?

A:     No. Neither of those guys are.

Q:     Okay.

A:     We actually didn't have any football players working during --
because this was during football season. So during football
season, football players don't work.

**{¶57}** Thus, there is conflicting evidence as to whether this occurred in the summertime or during football season. Further, the bartender testified that bouncers usually sit on the red barstool—the stools where Caleb and Forehead were positioned in the video—but that, on the night in question, they had already "stopped letting people in at 1:30," and the front door would be locked and "[y]ou can't come in it." So, bouncers leave the front around that time. However, a review of the video shows that Jaalen was able to reenter the bar at 1:56.

**{¶58}** Martino's next relied on the bartender's assertion that "employees" of Martino's wear black shirts. The bartender did testify that "employees" wear either a black shirt or Cincinnati attire. However, when asked if it was "safe to say" that anyone not wearing a black shirt would not be a Martino's employee, he responded, "That's kind of hard to answer. I will say, for the most part, working at Martino's, we're told

to wear either Martino's attire or Cincinnati attire." Directly after this, he was asked if Forehead was an employee at that time, and he replied, "I can't answer that question. I've seen him around, but I don't know if he worked for Martino's or if he didn't." He was then asked if Forehead or Caleb were working that night and he said that he did not know. When asked if they had worked there "before," he said, "That is a question for [the bar owner or the bar manager]. I do not hire people."

{¶59} Further, the record reveals an issue as to whether the "typical" employment rules were applicable to the bouncers. The bartender testified that bouncers are "usually paid on the side." The discovery responses indicate that employment files don't exist for employees paid in cash. Whereas the bartender testified that, as a bartender, he had to complete paperwork for "taxes and stuff" and received a W-2 for his employment. Thus, it appears there were differing requirements depending on the position held at Martino's. Notably, while there is testimony that "employees" are required to wear black or UC gear, there is no evidence that specifically says that the *bouncers paid in cash* were also required to dress in this manner.

{¶60} Martino's lastly claimed that there was no evidence that Caleb and Forehead were otherwise acting as if they were employed by Martino's. However, the record contains sufficient circumstantial evidence from which a reasonable person could find that Forehead and Caleb were acting as bouncers for Martino's. As pointed out by Clark, the video shows that Caleb and Forehead were located by the red barstools that the bartender said the bouncers usually sit on. Beyond that, these individuals inserted themselves in the dispute between Clark and the bartender, they both attempted to take Clark out of the bar at differing points in the altercation, and the bar manager released Clark to Caleb to be removed from Martino's at the end of

the altercation. Further, Clark testified that he believed these individuals to be bouncers because of where they were located in the bar and because the bartender motioned or pointed to them—prior to the video beginning—during their dispute over the receipt. Even further, these individuals were not near the other patrons, nor did they have any food or drink with them. Rather, they were located near the exit where the bouncers usually sit, one on each side of the partition. When viewed in a light most favorable to Clark, this evidence could support a reasonable inference that these individuals were acting as bouncers for Martino's.

**{¶61}** Notably, Martino's asserts that other inferences can also be made from the evidence. However, the summary-judgment standard requires that all reasonable inferences be made in favor of the nonmoving party. Martino's also claims that Clark's assertions require "layers of inferences" and speculation. Yet, Clark's arguments are simply reliant on circumstantial evidence. There is no stacking of inferences or speculation.

**{¶62}** Based on the foregoing, we sustain the assignment of error in part as to the vicarious-liability claim as genuine issues of material fact remain for trial on this claim.

### C. Premises Liability

**{¶63}** "'A business owner has a duty to warn or protect its business invitees from criminal acts of third parties when the business owner knows or should know that there is a substantial risk of harm to its invitees on the premises in the possession and control of the business owner.'" *Whisman v. Gator Inv. Props.*, 2002-Ohio-1850, 23 (1st Dist.), quoting *Simpson v. Big Bear Stores Co.*, 73 Ohio St.3d 130 (1995), syllabus. "In other words, a duty exists where a risk is reasonably foreseeable." *Id.*,

citing *Menifee v. Ohio Welding Prods. Inc.*, 15 Ohio St.3d 75, 77 (1984).[5]

*1. Arguments*

**{¶64}** Clark does not challenge the trial court's finding that Martino's could not have foreseen that Forehead and Caleb would perpetuate an assault before they had any interaction with Clark. Rather, Clark argues that Martino's had a duty *after the assault began* to protect him—as an invitee—from foreseeable harm and it breached this duty where it did not "take reasonable action to stop the assault." Clark asserts that he made this argument below and that the trial court erred when it failed to address it.

**{¶65}** More specifically, he argues that, when a bar owner is aware of an ongoing fight between two patrons, the resulting harm is generally foreseeable so the bar or "tavern operator" has a duty to stop the fight as soon as possible after it starts. In other words, Clark essentially argues that Martino's had a duty to rescue him after the fight began as it was "obviously" foreseeable that he would suffer "great harm if the assault was prolonged," and Martino's breached this duty where the bartender did not take reasonable action to stop the assault and instead "stood by and merely watched the assault for a time," and where the bar manager handed Clark back over to "one of the assailants" who, foreseeably, continued to assault Clark by "pushing/throwing him out the door of the bar."

**{¶66}** Martino's argues that the trial court correctly found that the fight was not foreseeable and that the law in the First District is that a business owner is not an

---

[5] Martino's also argues that Clark was a trespasser. However, this argument was not made below. In fact, the trial court expressly found that the parties agreed that Clark was a business invitee. Consequently, we decline to address this argument here. *See generally Niskanen v. Giant Eagle, Inc.*, 2009-Ohio-3626 ¶ 34, quoting *State ex rel. Zollner v. Indus. Comm.*, 66 Ohio St.3d 276, 278 (1993) ("[I]t is well settled that '[a] party who fails to raise an argument in the court below waives his or her right to raise it [on appeal].'").

insurer of an invitee's safety. Martino's further argues that the bar manager did intervene in the fight to rescue Clark.

### 2. *Analysis*

**{¶67}** In support of his argument, Clark points to *Heys v. Blevins*, 1997 Ohio App. LEXIS 2536 (2d Dist. June 13, 1997).

**{¶68}** In *Heys*, Heys was in a hair salon getting her hair done. *Id*. at *1. As she was sitting under the dryer, Blevins approached her and jerked her from underneath the hair dryer. *Id*. Heys claimed that Blevins dragged her across the floor of the salon and beat her on the face, head, and body. *Id*. at *2. Heys further claimed that Blevins pulled her outside the entrance to the salon and beat her for six or seven minutes until Blevins's husband and son-in-law pulled her off Heys. *Id*. Heys contends that Vance, the salon owner, watched the entire assault and did nothing to prevent the assault, to stop the further assault, or to help Heys after the assault. *Id*. Vance admitted she never called the police or paramedics and later told a police officer that she did not call for police or medical assistance because she was familiar with Blevins and her family and was afraid of repercussions. *Id*. Looking to Restatement of the Law 2d, Torts, § 314 (1965), the appellate court held that Vance had a duty to rescue and/or aid Heys from Blevins's assault. *Id*. at *19. However, the court found that a question of fact existed as to whether Vance breached the duty to safeguard Heys from Blevins's assault. *Id*. at *20.

**{¶69}** Even assuming that *Heys* is applicable here, the instant matter is distinguishable. Under section 314 of the Restatement, the duty owed is only a duty to exercise reasonable care. *Id*. at *13, quoting Restatement § 314. A business would not be required to take any action which is unreasonable, nor would it be required to give aid to one "whose friends are present and apparently in a position to give him all

necessary assistance." *See id.* Beyond that, courts have generally found that "reasonable care does not require a business owner to place him or herself in peril in order to rescue an invitee." *Id.* at *18. Rather, calling the police generally will be sufficient to satisfy the business owner's duty. *Id.*

**{¶70}** In *Heys*, the evidence was that Vance just watched the entire assault, which lasted over six-to-seven minutes, and did nothing, not even call the police. *Id.* at *2. Thus, since Vance did not call the police, the court held that an issue of fact existed as to whether Vance breached her duty to rescue Heys. *See id.* at *20. Implicit in this holding is the fact that Vance had the opportunity to call the police during the assault.

**{¶71}** Here, the alleged assault on Clark, in total, lasted under 30 seconds, and Jaalen arrived to help Clark within 20 seconds from when the assault began. During that time, the bartender was trying to tell Clark just to get out of the bar. Clark appears to argue that the bartender should have intervened; however, the assault occurred after Clark slapped the bartender and the bartender was not required to place himself in peril in order to rescue Clark. Further, the bartender did not have the opportunity to contact the police during the assault. Beyond that, once the bar manager approached the altercation, he stepped in front of Caleb and was holding Caleb back from continuing the altercation until Clark reinitiated another altercation with the bartender, at which point the bar manager had to step away from Caleb and intervene to protect the bartender. Ultimately, it was Clark's own actions that led to further confrontation once the bar manager tried to stop the fight. It should also be noted that both Forehead and Caleb attempted to remove Clark from the premises at certain breaks in the altercation and the altercation was only reinitiated upon further action from either Clark or his friend Jaalen. Thus, Clark failed to establish any issue of fact

as to whether Martino's failed to exercise reasonable care under the circumstances. Therefore, we overrule the assignment of error as to the premises-liability claim.

### *IV. Conclusion*

{¶72} For the foregoing reasons, we sustain the assignment of error in part and reverse the trial court's grant of summary judgment as to the vicarious-liability claim as genuine issues of material fact remain to be determined on this claim. As to the premises-liability claim, we overrule the assignment of error as to this claim and affirm the trial court's grant of summary judgment in favor of Martino's on this claim. The cause is remanded for further proceedings on the vicarious-liability claim.

Judgment affirmed in part, reversed in part, and cause remanded.

**KINSLEY, P.J.,** and **BOCK, J.,** concur.